**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mildred Karen WOODS, Cathy Lynn
Goldstein, Defendants-Appellants.**

**Nos. 83–5006, 83–5007.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 1983.

Decided Nov. 15, 1983.

Bruce R. Castetter, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Barton Sheela, III, La Jolla, Cal., Michael J. McCabe, San Diego, Cal., for defendants-appellants.

Before ALARCON and NORRIS, Circuit Judges, and PRICE *, District Judge.

ALARCON, Circuit Judge:

Mildred Karen Woods and Cathy Lynn Goldstein appeal from the judgment of conviction of each for conspiracy to possess cocaine with intent to distribute. Goldstein also appeals from the judgment of conviction for possession of cocaine with intent to distribute.

We are asked to reverse the judgment on the ground that the district court erred in denying each appellant's motion to suppress evidence essential to prove their guilt of each crime. Our independent review of the record has persuaded us that the district court properly denied the motion to suppress.

We must look to the totality of the circumstances known to the officers prior to the challenged searches and seizures in order to decide if their conduct was consistent with the demands of the fourth amendment.

* Hon. Edward Dean Price, United States District Judge for the Eastern District of California, sitting by designation.

## I.

### PERTINENT FACTS

Woods and Goldstein were arrested on August 30, 1982 at the San Diego Airport by members of the Narcotics Task Force Unit of the San Diego Sheriff's Department. Four or five months earlier, Cory Lerner, the district manager of an air force cargo service, voluntarily contacted Larry Lundsford, a deputy sheriff assigned to the Narcotics Task Force. Lerner stated he wanted to give information concerning individuals who were selling cocaine. Deputy Lundsford went to Lerner's office. Lerner informed Lundsford that he had purchased cocaine from Woods, her husband, and Nancy Graves. Lerner also told Deputy Lundsford that he was involved in a drug rehabilitation program to control his use of cocaine. Lerner provided Deputy Lundsford with information concerning the telephone numbers and addresses of narcotics dealers which, upon investigation, proved to be accurate. Lerner also made controlled purchases of narcotics from persons not involved in this matter. These purchases resulted in the conviction of these individuals. It was deputy Lundsford's opinion that Lerner was truthful and reliable.

Lerner lived in the same apartment building as did Nancy Graves. Deputy Lundsford asked Lerner to assist in the investigation of Nancy Graves and Mildred Woods.

Lerner informed Deputy Lundsford that Mildred Woods was pregnant and was no longer involved in direct sales of cocaine. Instead, she supplied Nancy Graves with cocaine for resale.

Two to three weeks before August 30, 1982, Lerner informed Deputy Lundsford that Nancy Graves had told him that "good stuff would be coming in from back East within a week or two."

At approximately 11:45 a.m., on August 30, 1982, Lerner called Deputy Lundsford to inform him that while in Nancy Graves' apartment that morning he had overheard a telephone conversation during which Nancy Graves said she could not accompany Woods to the airport that day. Graves told Woods to take her son, Jan along and "to dress down to avoid being conspicuous." Lerner told Lundsford that Woods was approximately 32 to 33 years old with dark curly hair and was seven to eight months pregnant. Her son was four to five years old. Lerner also reported that Woods was going to meet a plane arriving between 12:00 and 12:30 p.m. The arriving passenger would be a woman in possession of a quantity of cocaine. Woods would be carrying approximately $7,000. The transaction would take place at the airport and the woman delivering the cocaine would take a return flight that same day.

Deputy Lundsford arrived at the San Diego Airport at 12:15 p.m. He was joined by three other officers.

At 12:25, Deputy Lundsford observed two women accompanied by a four or five year old boy. One of the women was 5'2" to 5'3" tall, with curly, black-brown hair who was "very pregnant." The woman entered the United Airlines ticket line. Both women continually looked around at the people in the line and appeared to be "apprehensive." According to Deputy Lundsford this behavior is typical of participants in narcotics sales. While they waited in line, Woods removed a red and white box from her purse. She removed the lid from the box and presented it to the other woman who "thumbed through the box looking at the contents." Based on his experience observing narcotics transactions, Deputy Lundsford concluded that this was a "money show." This term is used to describe the reassuring display of purchase money to a vendor by a customer. As the two women left the ticket line they looked over their shoulder "as if checking for surveillance."

Deputy Lundsford was told by the United Airlines ticket agent that the taller woman [Goldstein] wanted to buy a ticket to New York for that afternoon. The ticket agent referred her to another airline in the west terminal.

Goldstein was next observed purchasing a ticket from an American Airlines ticket agent. After Goldstein left the area one of the officers was told that she had arrived at

12:18 p.m. on a round trip flight from New York with a return flight scheduled two days later.

She purchased a ticket to New York on a flight leaving at 2:00 p.m. that day. She told the agent she had to return that day because of an illness or injury to a member of her family.

The women were followed to a cocktail lounge in the west terminal.

Deputy Lundsford decided to "contact the ladies" because he believed that all the information given to him by Lerner had been corroborated.

Deputy Lundsford, accompanied by two officers, walked up to Woods and Goldstein who were seated in the cocktail lounge, and identified themselves as police officers. Each of the officers was in plain clothes. At this time it was Deputy Lundsford's intention to "detain them for identification purposes." It was his undisclosed state of mind that they were not free to leave, had they attempted to do so, until the completion of the investigation. Woods and Goldstein were told that they were narcotics officers who were investigating a possible narcotics transaction. Goldstein became "visibly shaken and upset." Woods appeared "somewhat nervous."

The women were asked for identification. Woods produced a California driver's license bearing the name Mildred Woods. Goldstein had a Colorado driver's license with the name Cathy Goldstein.

Goldstein was asked for her airline ticket. The airline ticket was made out to Mrs. James Winston. The ticket was not returned to Goldstein.

Goldstein was asked when she had arrived in San Diego and how long she intended to stay. She told the officers that she had arrived at 12:15 and was going to stay with Woods for a few days. Woods and Goldstein were not admonished as to the requirements of the fifth and sixth amendments while in the cocktail lounge.

Deputy Lundsford testified that after observing the driver's license and Goldstein's airline ticket and receiving the false answer from Goldstein as to her travel plans, the women were taken to the Harbor Police office to "continue the investigation."

In the Harbor Police station the women were separated. Woods was asked what was in the red and white box which was sticking out of her purse. She replied, "about $6,000."

Goldstein was asked "about her staying a few days with Mrs. Woods." Goldstein replied that she had not made up her mind and might be going home that afternoon. Deputy Lundsford asked her if she had any luggage. She stated she had already placed it in Mrs. Woods car.

After making these statements in response to the officer's questions, both women were formally arrested. No *Miranda* warnings were given prior to the arrest.

A search was conducted of the red and white box and $6,143.00 was seized.

Goldstein was also searched. Two plastic baggies containing cocaine were located tied around each ankle.

II.

The trial judge, after reciting the facts which influenced his decision, concluded that (1) Lerner was a reliable informant; (2) the information Lerner related to Deputy Lundsford concerning the narcotics transaction discussed over the telephone was corroborated by Deputy Lundsford's observations and the investigation he conducted at the airport prior to speaking to Woods and Goldstein in the cocktail lounge, the information gathered in the cocktail lounge, and the statement made by Woods in the Harbor Police station constituted "founded suspicion which ripened into probable cause." The district court also declared that "the agent's conduct was reasonable and the arrest lawful."

After the denial of the motion to suppress in this matter the Supreme Court decided *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The government has forthrightly conceded in its brief before this court that under *Royer* these appellants were "effectively under arrest"

when they were taken from the cocktail lounge to the Harbor Police station. Accordingly, the government suggests that this court must restrict its determination of the existence of probable cause to those facts known to the arresting officers prior to the removal of the appellants from the cocktail lounge. We accept the government's concession and limit our review of the legality of the arrests and seizures, and the fruits thereof, to those facts known to the officers prior to the time appellants were taken from the cocktail lounge to the Harbor Police station.

## III.

Woods seeks a ruling from this court suppressing her statements in the cocktail lounge and in the police station, and the box and its contents under the exclusionary rules emanating from the fourth, fifth, and sixth amendment.

Goldstein challenges the admissibility of her statements, the information derived from the airline ticket, and the cocaine for the same reasons advanced by Woods.

## IV.

### A. *Fourth Amendment Analysis*

We first consider whether the statements and the physical evidence seized were inadmissible under the fourth amendment.

### 1. *Predetention Statements*

■ When the officers approached Woods and Goldstein in the airport's cocktail lounge, the women were asked to identify themselves. Each produced a driver's license which gave her name. Law enforcement officers do not violate the fourth amendment by approaching an individual in a public place and putting questions to him or her. The person so questioned need not answer any questions and is legally free to ignore the officer, or to walk away. His or her voluntary answers to the officer's questions are admissible in a criminal prosecution. The fact that the officer identifies himself as a police officer does not "convert the encounter into a seizure requiring some level of objective justification." *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

■ Thus, under *Florida v. Royer,* the driver's license identification and the initial responses given by Woods and Goldstein in the cocktail lounge were admissible because they were voluntary responses to permissible and limited questions prior to any physical detention or seizure of their persons. There being no seizure within the fourth amendment, no constitutional rights were infringed. *Id.* at 1324.

Appellants argue that the fact the officers intended to detain them if they had attempted to leave made their responses inadmissible. In *Williams v. United States,* 381 F.2d 20 (9th Cir.1967) we disposed of the same contention as follows: "The fact that the officers had entertained an unexpressed intention to detain appellants had they compounded suspicion by refusing to answer and attempting to run away does not amount to detention." *Id.* at 22.

### 2. *Statements Given During a Valid Detention*

■ A temporary detention or seizure of a person is "justifiable under the fourth amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer,* 103 S.Ct. 1319 at 1324. Furthermore, during such a temporary seizure of the person based upon a reasonable suspicion of criminal activity, the officers may ask questions of the suspect which are limited to the purpose of the stop in order to verify or dispel such suspicion. *Id.* at 1324.

■ In the instant matter, the officers asked Goldstein for her airline ticket and questioned her as to the length of her stay in San Diego. The taking of Goldstein's airline ticket was a clear objective indication that she was being temporarily detained. We are satisfied that the facts known to the officers prior to examining Goldstein's ticket created a reasonable suspicion that Woods and Goldstein were involved in a narcotics transaction. The offi-

cers had received information from an informant that a pregnant woman accompanied by a small child was going to meet a woman who would be arriving at the San Diego airport carrying cocaine. The informer's tip was verified by the officer's personal observations. *See Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–1924, 32 L.Ed.2d 612 (1972). They saw a pregnant woman accompanied by a small child at the airport show the contents of a box to another woman. To the eyes of an experienced narcotics officer this conduct indicated that a purchaser of narcotics was proving to his supplier that he had the required amount of money to consummate a sale. A police officer's special training and experience may enable him reasonably to suspect that criminal activity is afoot from observing what might appear innocuous to the uninitiated. The officers were also aware that Goldstein was going to return to New York after staying approximately two hours in the San Diego Airport. The informant had told the officers that the person delivering the narcotics would return the same day. As we will discuss below, the facts known to the officer at the time they approached the cocktail lounge were sufficient to establish probable cause to arrest. They were clearly enough to raise a reasonable suspicion.

■ The questioning of Goldstein in the cocktail lounge after her tickets were handed to the officer were limited to the purpose of the stop, *i.e.,* to verify or dispel the suspicion that she was engaged in the illegal transportation of drugs to San Diego and having accomplished her purpose would return to her home as soon as possible. Goldstein's statements in response to this limited interrogation were admissible.

Further, asking for and examining her airline ticket was permissible as part of an investigative detention. *See Florida v. Royer,* 103 S.Ct. 1319 at 1325.

B. *Statements Made After an Arrest*

■ Physical evidence and statements obtained after a person is under formal arrest or who has been removed from a place of temporary detention to custodial surroundings are inadmissible unless probable cause existed for such arrest. *Id.* at 1325; *Dunaway v. New York,* 442 U.S. 200, 212–216, 99 S.Ct. 2248, 2256–2258, 60 L.Ed.2d 824 (1979).

It is clear to us that Woods and Goldstein were under arrest as of the time they were moved from the cocktail lounge to the Harbor Police station. The fact that they were not told they were under arrest until later is not relevant. *Dunaway v. New York,* 442 U.S. at 212, 99 S.Ct. at 2256.

■ An examination of the facts known to the officers at the time Woods and Goldstein were removed from a public place to custodial surroundings shows that probable cause existed for their arrest at that time. These facts can be summarized as follows:

1. The officers had received information from a known informer whose prior tips had proved accurate upon independent verification.

2. The informant had participated in the purchase of narcotics from persons he had previously identified as engaged in drug traffic.

3. Four or five months before the August 30, 1982 arrest at the airport, the informant identified Woods and Nancy Graves as persons who sold cocaine to him.

4. Two to three weeks before August 30, 1982, the informer had advised the police that Nancy Graves had told him that "good stuff" would be coming in from the east within a week or two.

5. The informant told the police that Woods was pregnant and no longer making direct sales. Instead she was now supplying cocaine to Nancy Graves.

6. On August 30, 1982, the informant told the police he had just overheard his cocaine supplier talking to Woods on the telephone. In this conversation, Lerner overheard Graves aiding, abetting, and encouraging Woods in planning the purchase of narcotics from someone who would be flying into the San Diego airport that same day.

7. The informant told the police that the cocaine courier would take a return flight on the same date.

8. The informer gave a complete physical description of Woods including the fact that she was seven or eight months pregnant and would be accompanied by a four or five year old boy.

Every fact contained in the informer's tip proved to be accurate.

1. The officers were able to identify Woods at the San Diego airport from the physical description given by Lerner.

2. She was accompanied by a four or five year old boy.

3. Woods was observed making a "money show" to a woman who had just arrived from the east (Goldstein).

4. Goldstein changed her reservation to a return flight for the same date.

5. Woods, when questioned in the cocktail lounge identified herself as Mildred Woods, the name furnished by Lerner as one of his cocaine dealers and the pregnant person who was going to purchase cocaine at the airport.

6. Goldstein, when questioned about the length of her stay in San Diego gave a false answer.

In deciding whether a given set of facts establishes probable cause for an arrest without a warrant, we are required to assess the totality of the facts and circumstances known to the officer prior to the seizure of the person of the accused. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949). In *Brinegar,* the court stated: "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175, 69 S.Ct. at 1310. Thus, in reviewing the district court's conclusion that probable cause existed to arrest appellants, we must decide whether, based on the totality of the circumstances known to the officers, including the veracity and the basis of knowledge of their informant, there was a fair probability that appellants had committed a crime. In assessing the totality of the circumstances, we must take into consideration whether the details of the informer's report have been independently verified by the police.

In *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the court illustrated the value it places on police verification in the following passage:

> The information given to narcotic agent Marsh by "special employee" Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found to be accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had "reasonable grounds" to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true. *Id.* at 312–313, 79 S.Ct. at 333.

Appellants Woods and Goldstein argue that some of Lerner's information was based on supposition, feelings, or beliefs based on prior conversations with Graves. For example, Lerner told the officers it was his "feeling" that the sale of narcotics would occur between 12:00 and 12:30 that day and it was his "belief" that the other person would be a woman arriving on a plane from the east coast or New York.

Each of these inferences, however, proved to be accurate upon independent verification by the officers. There is no requirement under *Draper* that the tip contain the basis for the information or that the informer be a percipient witness to the reported facts. "[T]he detailed and accurate predictions" in Lerner's tip indicated that, however his information was obtained, it was reliable. *See Illinois v. Gates,* 103 S.Ct. 2317, 2341 fn. 12. The information given by Lerner was more detailed and accurate than that found sufficient to show probable cause in *Draper.* Having independently reviewed the facts, we conclude that probable cause existed for the arrest of Woods and Goldstein at the time they were escorted from the cocktail lounge. In reaching this result, we note again that we have not considered the statements made to the Harbor Police officer prior to any *Miranda* warnings. As we explain below, those statements were inadmissible for any purpose because they were obtained in violation of appellants' fifth and sixth amendment rights. We are satisfied that probable cause to arrest existed prior to any questioning which occurred *after* appellants were removed from the cocktail lounge.

## C. *Fifth and Sixth Amendment Analysis*

Woods and Goldstein ask us to order suppression of their statements in the cocktail lounge and in the Harbor Police station which were elicited prior to any admonition of their rights under the fifth and sixth amendments as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As discussed above, at the time that Goldstein's airline ticket was taken from her, appellants were lawfully detained by the police until they were moved to the Harbor Police station. Appellants argue that the questioning which occurred in the cocktail lounge was custodial interrogation because the officers had announced that they were conducting a narcotics investigation and the surrounding circumstances reasonably indicated they were not free to leave. Appellants apparently believe that questioning

during a lawful temporary detention or seizure of the person is custodial interrogation. No authority is cited in support of this proposition. The law of this circuit is to the contrary. The same contention was made in *United States v. Collom,* 614 F.2d 624 (9th Cir.1979), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278. There we disposed of this issue as follows:

> Stephen asserts that even though an arrest had not been made at this point, his statements to the officers should have been suppressed because *Miranda* warnings were not given. We disagree. We have held on numerous occasions that even though one's freedom of action is inhibited to some degree during an investigatory detention, *Miranda* warnings need not be given prior to questioning in that circumstance. *Id.* at 628.

Thus, under *Collom,* the fact that Woods and Goldstein were not free to leave the cocktail lounge and had been advised that they were being questioned by narcotics officers conducting an investigation did not convert a temporary seizure of their persons into custodial interrogation.

Although not clearly articulated, it is apparently appellants' view that any questioning in a public place conducted by law enforcement officers when a person has been temporarily detained is coercive and thus custodial. The Supreme Court, however, has drawn a distinction between a coercive environment and custodial surroundings in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). The Court said:

> ... a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But

police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited. *Id.* at 495, 97 S.Ct. at 714.

We conclude that the brief questioning of appellants in the cocktail lounge was not custodial under *Miranda* simply because they were under investigation for a narcotics violation and were not free to leave.

At oral argument it was suggested for the first time that if probable cause existed for the arrest of appellants prior to the questioning which occurred in the cocktail lounge, their statements were inadmissible under *Miranda v. Arizona.* Appellants contended that because the officers had focused their investigation on them, they were not seeking to confirm or dispel a suspicion of possible criminal activity, but were engaged in gathering corroborative evidence to enhance their chances of obtaining a conviction. Appellants also advanced the theory that permitting officers to continue questioning a suspect during a lawful temporary seizure of the person after probable cause for an arrest exists is an impermissible evasion of the requirements imposed by *Miranda.*

Similar arguments have been rejected by the Supreme Court. In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the appellant was interrogated in his private residence by two federal agents. Before the Supreme Court Beckwith argued that *Miranda* must be applied after a police investigation has focused on a suspect. The Supreme Court disposed of this contention in the following language:

[The argument] goes far beyond the reasons for that holding and such an extension of the *Miranda* requirements would

cut this Court's holding in that case completely loose from its explicitly stated rationale. The narrow issue before the court in *Miranda* was presented very precisely in the opening paragraph of that opinion—"the admissibility of statements obtained from an individual who is subjected to *custodial* police interrogation." *Id.* at 345, 96 S.Ct. at 1615–1616.

In *Beckwith,* the Court quoted with approval the following language from *United States v. Caiello,* 420 F.2d 471 (2d Cir.1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650:

It was the compulsive aspect of *custodial* interrogation, not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to *custodial* questioning. (emphasis added). *Id.* at 473.

In *Hoffa v. United States,* 385 U.S. 293, 309, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966) the appellant argued that his statements were inadmissible because "the Government had sufficient ground for taking him into custody and charging him with endeavors to tamper with the Test Fleet jury. Had the government done so, it could not have continued to question the petitioner without observance of his Sixth Amendment right to counsel."

The Supreme Court disposed of this contention as follows:

Nothing in *Massiah,* in *Escobedo,* or in any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to

establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction. *Id.* at 310, 87 S.Ct. at 417–418.

In *Lowe v. United States,* 407 F.2d 1391 (9th Cir.1969), we applied the principle quoted above from *Hoffa* in a matter arising after the *Miranda* decision. We construed *Hoffa* as follows: "[W]hether or not the police have probable cause for arresting the suspect, has no relevance as to when the person's right to receive warnings attaches." *Id.* at 1396. Later in the *Lowe* opinion we noted:

> It follows that *the time when* the officer's intent to arrest is formed has no bearing on the question of whether or not there exists "in-custody" questioning. Whether a person is in custody should not be determined by what the officer or the person being questioned thinks; there should be an objective standard. Although the officer may have an intent to make an arrest, either formed prior to, or during the questioning, this is not a factor in determining whether there is present "in-custody" questioning. *Id.* at 1397.

■ Applying these principles to the matter at hand, we must conclude that the fact that the officers may have believed they had probable cause to arrest Woods and Goldstein did not make their statements in the cocktail lounge inadmissible simply because they were not taken into custody until they were escorted to the Harbor Police station.[1]

■ The statements made in the Harbor Police station *prior* to any *Miranda* warnings, however, were inadmissible for any purpose because at that time appellants were in custody.

We have made an independent examination of the entire record in this matter. It is our view that appellants' statements in the cocktail lounge were made freely and

voluntarily in spite of the fact that they were aware that they were being questioned by law enforcement officers. We are also satisfied that the statements elicited in the Harbor Police station prior to the time they were admonished as to their *Miranda* rights were inadmissible, but this error was harmless beyond a reasonable doubt in view of the overwhelming competent evidence while demonstrating their guilt. Further, probable cause existed for their arrest at the time the box, money, and cocaine were seized. Thus, no fourth amendment violation was committed by the officers.

The judgment is AFFIRMED as to each appellant.

---

1. There is no evidence in this record that the officers deliberately delayed making a formal arrest in order to evade compliance with *Miranda.* Thus, we do not address that issue here.