PEARLIE RODDY, Plaintiff-Appellee, v. GARY CATTO, Defendant-Appellant.

Fifth District    Nos. 5—84—0566, 5—84—0659 cons.

Opinion filed April 15, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for appellant.

LeChien & Associates, Ltd., of Belleville (Robert P. LeChien, of counsel), for appellee.

JUSTICE JONES delivered the opinion of the court:

Plaintiff, Pearlie Roddy, brought the instant action for damages under 42 U.S.C. sec. 1983 (1980), claiming that her civil rights were violated when she was arrested and detained on a forgery charge pursuant to an allegedly invalid warrant and without probable cause. Following a jury trial, judgment was entered on the verdict in the amount of $18,500 against the defendant, Gary Catto, who, as a State criminal investigator, had procured the warrant in question and effected the arrest of the plaintiff. The court subsequently awarded the plaintiff attorney fees under 42 U.S.C. sec. 1988 (1980) in the amount

of $14,949, plus costs of $226.40. On appeal defendant Catto contends that he was entitled to judgment as a matter of law on the issue of liability where the plaintiff was arrested pursuant to a facially valid warrant following determination by an independent intermediary that there was probable cause for her arrest and where there was sufficient evidence of probable cause to justify such arrest even in the absence of a valid warrant. In addition, the defendant contends that the plaintiff failed to prove damages of $18,500 and that the trial court's award of attorney fees under section 1988 was excessive. We reverse on the issue of liability and, therefore, do not consider the issues of damages or attorney fees.

The incident giving rise to the alleged false arrest of the plaintiff occurred on May 16, 1980, when a forged Public Aid warrant was presented for payment and cashed at the Centreville Market in Centreville, Illinois. The check was later returned as stolen, and the defendant, an investigator with the Division of Criminal Investigation in the fraud and forgery unit, was assigned to investigate the incident.

During the course of the investigation, after defendant Catto believed that he had obtained an identification of the plaintiff as the perpetrator of the offense, he presented this information to an assistant State's Attorney, who prepared a criminal complaint charging the plaintiff with forgery. The defendant subsequently appeared before Judge Thomas O'Donnell of the St. Clair County Circuit Court, who issued a warrant for the plaintiff's arrest on August 6, 1980. The plaintiff was arrested on August 20, 1980, and detained in St. Louis for two days. She was then brought to Illinois where she remained in jail until she was released on bond on August 29, 1980.

Following a preliminary hearing on August 29, 1980, the court found probable cause to believe that the plaintiff had committed the offense charged, and, on October 2, 1980, the grand jury returned a bill of indictment against the plaintiff on the charge of forgery. On December 10, 1980, the charge was dismissed with prejudice upon motion by the State's Attorney in a judgment stating that "the State's witnesses indicate that [the plaintiff] did not perpetrate the crime charged." The plaintiff subsequently sought and obtained an order to expunge all records of her arrest on the criminal charge.

On April 13, 1981, the plaintiff brought the instant action for violation of her civil rights under section 1983, alleging that her arrest and detention were effected without probable cause and that the procedures by which the warrant was obtained did not comply with Illinois statutory requirements. The plaintiff sought damages for injury

to her reputation, mental and physical pain and suffering, and money paid in posting bond for which she was not fully reimbursed.

At trial, commenced June 11, 1984, defendant Catto testified that his investigation of the forgery incident had begun with a security photograph taken at the time the Public Aid warrant was cashed at the Centreville Market. The photograph depicted a woman and an elderly man, Fred Williams, who had accompanied his niece, Kathy Jones, and the woman in the photograph to the store at his niece's request. Kathy Jones had informed Williams that her companion, identified as Lelia Johnson, had lost her Public Aid identification card and needed assistance in cashing a Public Aid warrant. At the store the woman presented the warrant for payment, and when payment was refused, Williams co-signed the warrant and it was cashed. Upon learning subsequently that the warrant was stolen and had been returned, Williams voluntarily made restitution to the market. Williams did not know the identity of the woman in question.

In attempting to identify the woman in the photograph, defendant Catto learned that Williams' niece, who might have supplied that information, had moved to Fort Wayne, Indiana. Attempts to locate her were unsuccessful. Defendant Catto also questioned employees of the Centreville Market. None of them except Mickey Garcia were able to identify the person in the photograph. Mickey Garcia told the defendant that the woman was a sister of Kevin Johnson, a former employee of the store, but defendant Catto never learned the name of Kevin Johnson's sister.

On June 19, 1980, defendant Catto took the photograph to the Public Aid office where a caseworker, Evelyn Walker, identified the woman in the photograph as Mildred Johnson. Another caseworker also stated that she believed that the photograph was of Mildred Johnson. Defendant Catto was advised that Mildred Johnson had moved to Joliet, Illinois, in April 1980, but that her mother, Irene Johnson, lived in the Centreville area. Defendant Catto interviewed Irene Johnson, who told him she did not know the woman in the photograph but did not believe it was her daughter. She also stated that her daughter had a friend named Kathy who might have been involved with a male in cashing forged Public Aid warrants.

Defendant Catto then traveled to Joliet to talk to Mildred Johnson, who denied having committed the forgery. She told him that she had lived in the Centreville area and had gone to the Centreville Market to cash checks, but that she had since moved to Joliet and had cashed the Public Aid warrant issued to her in May at a currency exchange in that area. Defendant Catto was able to verify that Mildred

Johnson had cashed her check in the Joliet area in May.

Defendant Catto continued his investigation with the assistance of law enforcement officials from the Centreville area. He enlisted the aid of Sylvester McWhorter, a detective with the Centreville police department, Robert Felton, chief of police of the Alorton police department, and Harvey Jones, a security officer of Centreville Township. Although the officers could not identify the woman in the photograph, they introduced him to local residents known to them who they thought might be able to make an identification.

Defendant Catto testified that on July 31, 1980, he met with Jessie Banner, a resident of Alorton, Illinois, who routinely socialized in the area of the Centreville Market and knew most of the people who patronized the store. Catto showed Banner the photograph taken at the time the check was cashed and asked him if he knew the woman in the photograph. According to Catto, Banner identified the woman as Pearlie Roddy from St. Louis, Missouri, and stated that he had known her a long time, although he did not know her address.

On the basis of this identification by Banner, a criminal complaint was prepared charging the plaintiff with forgery, and, on August 6, 1980, a warrant was issued for the plaintiff's arrest. Defendant Catto entered the information he had regarding the plaintiff into the computer used by police agencies to disseminate such information in the area. Catto then continued his investigation, seeking other individuals who might know the woman in the photograph.

On August 8, 1980, defendant Catto met with Robert Bell, a resident of East St. Louis who, like Banner and another companion, John Holmes, frequented the area of the Centreville Market. Catto testified that Bell, too, identified the woman in the photograph as Pearlie Roddy and further provided Catto with the plaintiff's address in St. Louis. On August 20, 1980, defendant Catto arrested the plaintiff at her home in St. Louis, and she was taken to a police station in St. Louis where Catto interviewed her. He then returned to the Belleville area where he continued his investigation by interviewing John Holmes on August 26, 1980. Catto testified that John Holmes also identified the woman in the photograph of the forgery incident as Pearlie Roddy and stated that she had lived with his brother "off and on for about six years."

At trial both Officers McWhorter and Jones corroborated defendant Catto's testimony regarding the identification of the plaintiff by Banner and Bell. McWhorter stated that Banner had identified the woman in the photograph taken at the store as "Pearlie Roddy who stays with Holmes and lived [sic] in St. Louis." McWhorter did not

know either the plaintiff or the Holmes referred to by Banner but did know Holmes' brother, John Holmes. McWhorter testified that Bell also had identified the woman in the photograph as Pearlie Roddy and had stated that she "stayed in St. Louis with John Holmes' brother." Officer Jones testified similarly that Banner and Bell had identified the woman in the photograph as a girlfriend of David Holmes, John Holmes' brother. Banner and Bell had given the plaintiff's name and had stated that she lived in St. Louis. Officer Felton, who had helped defendant Catto locate John Holmes, likewise corroborated Catto's testimony that Holmes had identified the woman in the photograph as "his brother's wife or girl friend or something like that."

In their testimony at trial both Banner and Bell denied having identified the woman in the photograph as the plaintiff. Banner admitted, however, that the woman in the photograph looked like Pearlie Roddy and stated that he knew the plaintiff, had seen her in the area, and knew that she "was going with" John Holmes' brother. Bell testified similarly that he had told defendant Catto that

> "the face [of the woman in the photograph] looked familiar. Names I couldn't call at the time because I didn't know the lady's name on the picture."

Bell stated that he had "seen Pearlie Roddy a couple of times" but did not know her name. He added that he had obtained the plaintiff's address from John Holmes who had said that the picture "looked like his sister-in-law." Although Bell initially denied that he had given the plaintiff's address to defendant Catto, on cross-examination he admitted having given him the address at a second meeting.

Regarding his identification of the plaintiff on August 26, 1980, John Holmes testified that defendant Catto had shown him the photograph taken in the store as well as another photograph, described by Holmes as a "house picture" or a "regular" photograph. Holmes stated that the picture he had identified as Pearlie Roddy was the second or "house" picture and not the picture taken in the store of the forgery incident. He testified that he had told defendant Catto that he knew Pearlie Roddy because she had lived with his brother for about six years "as girl friend and boy friend."

In addition to the discrepancies between the testimony of Banner, Bell and Holmes and the officers regarding the identification of the plaintiff as the woman in the photograph of the forgery incident, there were also discrepancies as to where the interviews of Banner, Bell and Holmes took place and who was present during the interviews. Officers McWhorter and Jones and the defendant differed in their recollection of the details of the interviews. McWhorter acknowl-

edged, however, that since he had made no report of the interviews that had occurred almost four years earlier, he would have to defer to defendant Catto's recollection of where the interviews had taken place. Defendant Catto had prepared written reports of all the various interviews during the course of his investigation for use in possible prosecution by the State's Attorney's office.

Defendant Catto testified that he had relied upon the identifications made by Banner, Bell and Holmes rather than those by the case-workers in the Public Aid office because Banner, Bell and Holmes "gave their identification without any hesitation. They did not have to think about it for more than fifteen seconds." Catto continued:

> "The identification that I obtained from the Public Aid office, even though I was provided with a name, it took these people a little time to come up with the name of Mildred Johnson and also, they told me that she was living in the Joliet area which indicated there was a possibility that she was not even around when this alleged crime occurred."

After the plaintiff had been arrested, defendant Catto obtained a handwriting sample from her and submitted it along with samples from Mildred Johnson and Fred Williams for comparison with the signature on the forged check. The document examiner was unable to make an identification from these samples. The plaintiff's fingerprints were also compared with a latent fingerprint from the forged check with similarly negative results. The defendant additionally presented Fred Williams with a photographic lineup consisting of the plaintiff's picture along with several others, but Williams was unable to identify the plaintiff's picture as being that of the perpetrator of the forgery. The defendant did not show the plaintiff's photograph to the employees of Centreville Market to see if they could identify her as the woman who had cashed the check.

Upon cross-examination, defendant Catto acknowledged that there was a discrepancy between the description given by Fred Williams of the forgerer as a black female, approximately 28 years old and weighing 150 pounds and that of the plaintiff, who was 36 years old and weighed 189 pounds. Catto observed, however, that the information from Williams was only an estimate on his part. Defendant Catto further acknowledged that the photograph of the forgery incident failed to show that the woman's face was pockmarked as the plaintiff's was. Although it appeared that the woman in the photograph was wearing a wig, the defendant did not ask to search the plaintiff's house for a wig when he arrested her at her residence. Defendant Catto testified finally that he had never heard the plaintiff's name before Banner

identified her as the woman in the photograph of the forgery incident and that he had conducted his investigation as usual without any attempt to "get" the plaintiff.

Plaintiff Roddy testified finally that when defendant Catto had arrested her and taken her to the police station for questioning, she had protested her innocence and had told him that she didn't know anything about the forged check or about the people in the picture of the forgery incident. The plaintiff stated that she knew both Banner and Holmes from having been around the Centreville area but did not know Bell and that she and her boyfriend, David Holmes, had gone over to Centreville on Sundays to visit his family there. She had never met defendant Catto nor heard of him before he came to her house to arrest her.

At the close of the evidence the jury returned a verdict for the plaintiff and against the defendant in the amount of $18,500. The trial court entered judgment on the verdict, and the defendant has appealed from that judgment and from the subsequent award of attorney fees.

On appeal, the defendant contends that the trial court should have directed a verdict or entered judgment *n.o.v.* in his favor on the issue of liability because (1) the issuance of a facially valid warrant served to insulate him from liability for any violation of the plaintiff's rights in effecting her arrest, (2) there was probable cause in any event for the plaintiff's arrest so as to preclude liability for such arrest, and (3) he was entitled to qualified immunity even if the arrest was improper where the evidence showed that his conduct in obtaining the arrest warrant was objectively reasonable.

Since the parties' oral argument in the instant case, the United States Supreme Court has rendered its decision in *Malley v. Briggs* (1986), 475 U.S. ____, 89 L. Ed. 2d 271, 106 S. Ct. 1092, addressing certain of the issues raised in this appeal. The petitioner in *Briggs*, Rhode Island State trooper Edward Malley, had been sued under section 1983 for damages resulting from the Briggses' arrest on charges that were subsequently dropped. On appeal Malley contended that his conduct in obtaining arrest warrants from a neutral magistrate prior to the Briggses' arrest should entitle him to absolute immunity from liability for their alleged false arrest. The supreme court rejected this argument, holding that a police officer is entitled only to qualified, not absolute, immunity when an alleged false arrest is made pursuant to a warrant based upon the officer's complaint and affidavit. Such qualified immunity would obtain, the court continued, only where the facts set forth in the warrant affidavit were such that a

reasonably competent officer could conclude that probable cause existed for the arrest. Under this standard the officer must have had an objectively reasonable basis for believing that the facts alleged in the affidavit were sufficient to establish probable cause, and he would not be shielded from liability merely because he had submitted such facts to a neutral magistrate believing them to be true.

In denying petitioner Malley's claim of absolute immunity, the *Briggs* court observed that "[the qualified immunity defense] provides ample protection to all but the plainly incompetent or those who knowingly violate the law." (*Malley v. Briggs*, (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 271, 278, 106 S. Ct. 1092, 1096.) Further, the court stated, under the "objective reasonableness" standard of *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727, applied in this context, liability would attach

> "if[,] on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." (*Malley v. Briggs* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 271, 278, 106 S. Ct. 1092, 1096.)

(See also *Pierson v. Ray* (1967), 386 U.S. 547, 18 L. Ed. 2d 288, 87 S. Ct. 1213 (qualified immunity established for police officers sued under section 1983 for false arrest).) Thus, the *Briggs* court, while declining to hold that issuance of the warrant in question provided an absolute shield of immunity, remanded the cause for a determination of whether petitioner Malley's conduct in applying for the warrant was objectively reasonable so as to render him immune from damages liability under the rule of qualified immunity.

In the instant case, defendant Catto's initial argument that issuance of an arrest warrant served to insulate him from liability must fail under the holding of *Briggs*. The *Briggs* decision, however, is not dispositive of the further issues of whether probable cause existed for the plaintiff's arrest or whether defendant Catto's conduct in applying for the warrant in question was objectively reasonable so as to entitle him to qualified immunity. We must, therefore, consider the evidence surrounding the defendant's investigation and his application for the warrant for the plaintiff's arrest to determine whether a reasonably competent officer could have believed that probable cause existed so that a warrant should issue. If this evidence, when viewed against the entire record, so overwhelmingly favors the defendant that no contrary verdict could stand, then the defendant was entitled to judgment as a matter of law, and the judgment for the plaintiff should be

reversed. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

██ █ It is settled that whether probable cause exists in a particular case depends upon whether the totality of facts and circumstances known to the officer at the time of the arrest would warrant a prudent person in believing that the arrested person had committed an offense. This totality of circumstances includes the reasonable trustworthiness of the information known to the officer and the veracity and basis of knowledge of the informants. (*United States v. Woods* (9th Cir. 1983), 720 F.2d 1022.) An arrest is not unconstitutional merely because the information upon which the officer relied later turns out to be erroneous (*McKinney v. George* (7th Cir. 1984), 726 F.2d 1183), as the probable cause determination looks to the information available to the officer at the time of the arrest and exacts from him a reasonable assessment of it, not a perfect one (see *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317). Thus, in order to prevail in the instant civil rights case, the plaintiff was required to prove not only that the information relied upon by defendant Catto was wrong but also that the defendant had reason to know this and, therefore, unreasonably relied upon it. *McKinney v. George* (7th Cir. 1983), 720 F.2d 1022.

Defendant Catto began his investigation here with a photograph taken at the time of the forgery incident depicting the woman who had committed the forgery. His primary task was to locate informants who knew the person in the photograph in order to make an identification. His initial attempts to gain an identification from the witnesses to the crime were fruitless, and subsequent identification of the woman in the photograph as Mildred Johnson proved unfounded when the defendant visited Ms. Johnson in Joliet. Ultimately, local police officers introduced the defendant to three informants, Jessie Banner, Robert Bell, and John Holmes, known by the officers to be familiar with the Centreville area and its people. All three informants knew each other and were able to recognize the plaintiff. They also were aware that she was "going with" or living with John Holmes' brother. After interviewing Banner and Bell, defendant Catto believed that he had obtained positive identifications of the plaintiff as the woman in the photograph, and he sought and obtained a warrant for the plaintiff's arrest based upon this information.

While, at trial, both Banner and Bell disavowed their identifications of the plaintiff as the woman in the photograph, their testimony was imprecise and evasive as to what they had actually told the defendant about the plaintiff. Banner admitted having had a conversa-

tion with the defendant "concerning Miss Pearlie" but could not recall the exact nature of the conversation: "All I was inquiring about was why did they pick me up." In similarly unresponsive testimony, Banner stated that the woman in the photograph "looked like" the plaintiff, although he denied having told the defendant that it was the plaintiff. Robert Bell, in his identification testimony, likewise stated that he had told the defendant that the woman in the photograph looked familiar, although he could not recall her name. Bell testified, however, that the same picture was shown to John Holmes, who identified the woman as his sister-in-law, the plaintiff. Bell additionally stated that he did not know where the plaintiff lived but that he had gotten her address from John Holmes and had later given it to the defendant.

Notwithstanding this equivocal testimony of Banner and Bell regarding their identifications of the plaintiff, defendant Catto testified that both men had identified the woman in the photograph as the plaintiff and that Bell had supplied her address in St. Louis. This testimony was corroborated by Officers McWhorter and Jones, who had helped the defendant locate Banner and Bell and knew them to be familiar with people in the area. While these officers' testimony was arguably self-interested, it is undisputed that defendant Catto did not know the plaintiff and had never heard her name before he began his investigation. There is no indication in the record that the defendant could have learned the plaintiff's name and address from a source other than Banner and Bell, who admittedly knew the plaintiff and had seen her in the Centreville area. Moreover, in seeking the warrant for the plaintiff's arrest and again at the preliminary hearing and grand jury hearing, the defendant represented that he had obtained positive identifications of the plaintiff as the woman in the photograph of the forgery incident, and no motive appears for the defendant to have willingly misled the prosecutor or perjured himself before the court. Thus, when the equivocal testimony of Banner and Bell is considered along with other evidence regarding their identifications of the plaintiff, the evidence was such that no jury question was presented as to whether the defendant had obtained positive identifications of the plaintiff before seeking her arrest.

Since the defendant had a photograph of the forgery incident itself, once he had obtained positive identifications of the plaintiff as the woman in the photograph, he had a reasonable basis upon which to determine that probable cause existed for the plaintiff's arrest. (*Cf. United States v. Everett* (11th Cir. 1983), 719 F.2d 1119, *cert. denied* (1984), 465 U.S. 1037, 79 L. Ed. 2d 709, 104 S. Ct. 1311 (probable

cause for arrest found once person observed passing a note known to be counterfeit was identified).) The plaintiff contends, however, that the defendant, in conducting his investigation of Mildred Johnson as a suspect, provided his own "yardstick" upon which to measure probable cause and that his investigation of the plaintiff as a suspect fell short of this standard and thus failed to establish probable cause. We find no merit in this argument, as the determination of probable cause to arrest the plaintiff did not depend upon the extent of the defendant's investigation of her or any other suspect. (*Cf. United States ex rel. Wright v. Cuyler* (3d Cir. 1977), 563 F.2d 627 (probable cause to arrest not diminished by existence of other suspects).) The fact, moreover, that the plaintiff's physical appearance did not conform precisely to the description given by Fred Williams of the forgerer did not render the defendant's determination of probable cause unreasonable. See *United States v. Glover* (D.C. Cir. 1984), 725 F.2d 120, *cert. denied* (1984), 466 U.S. 905, 80 L. Ed. 2d 157, 104 S. Ct. 1682.

■ We find, from a review of the evidence, that there was sufficient basis for the defendant's determination of probable cause and that the defendant acted reasonably in seeking the plaintiff's arrest so as to be immune from liability under the rule of qualified immunity in *Briggs*. The trial court's refusal to direct a verdict or enter judgment *n.o.v.*, therefore, constituted error, and we accordingly reverse the judgment of liability against the defendant for violation of the plaintiff's rights under section 1983. Since the award of attorney fees under section 1988 was premised upon the plaintiff's status as a "prevailing party" in the civil rights action, we likewise reverse the judgment for attorney fees imposed against the defendant.

Reversed.

KASSERMAN, P.J., and KARNS, J., concur.