**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael Jeffrey LOW,**
**Defendant–Appellant.**

**No. 88–1355.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 16, 1989.

Decided Oct. 5, 1989.

Michael R. Levine, Federal Public Defender, and Thomas W. Murphy, Asst. Federal Public Defender, Honolulu, Hawaii, for defendant-appellant.

Daniel Bent, U.S. Atty., and Michael K. Kawahara, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Before CHAMBERS and WIGGINS, Circuit Judges, and BREWSTER *, District Judge.

CHAMBERS, Circuit Judge:

Defendant–Appellant Michael Low pleaded guilty to possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and to possession of cocaine in violation of 21 U.S.C. § 844(a), reserving the right to appeal the district court's denial of his motion to suppress evidence pursuant to Fed.R.Crim.P. 11(a)(2). We affirm the district court's decision.

The following facts are based on the affidavit of Agent Hartman of the Drug Enforcement Administration (DEA) submitted in support of the warrant to search Low's bags and the testimony of DEA Agent Johnson at Low's preliminary/bail hearing (ER 5, 60).[1] On April 20, 1988, Los Angeles Police Department Officer Leham noticed a man later identified as Low departing the Pan Am ticket counter at the Los Angeles International Airport (ER 65). Low appeared to be very nervous ("looking all around at other persons") and when Low noticed Officer Leham looking at him, he immediately avoided eye contact by looking the other way (ER 65).

Officer Leham learned from the Pan Am ticket agent the following information: Low was flying under the name of Mark Lund; he had a reservation to fly to Honolulu that day on Pan Am flight 81 scheduled to depart Los Angeles at 1:00 p.m. with a return reservation on the same day on flight 82 scheduled to depart Honolulu at 10:00 p.m.; he purchased his airplane ticket with cash (ER 65–66).

Officer Leham saw Low seated in the terminal departure area with a carry-on bag wearing a red plaid shirt and display-ing the same nervous behavior described above (ER 66). Officer Leham later boarded flight 81 and saw Low seated, no longer wearing the red plaid shirt, but instead attired in a black-jogging type outfit, talking to another Hawaiian-looking man later identified as Mr. Akana who was showing Low articles from his pockets (ER 66). Officer Leham communicated his observations of Low to the DEA in Honolulu (ER 60, 65).

Upon flight 81's arrival in Honolulu, Agent Hartman observed Akana and Low exit the plane. Low was carrying a briefcase and a blue nylon bag. Both men made telephone calls (ER 68). While Low was on the telephone, Agent Hartman overheard him say, "This is Michelob;" "I'll call you at number one;" "Oh, I don't like hearing that" (ER 68).

After completing their telephone calls, Low and Akana walked toward the main terminal and while doing so, "stopped and rotated their heads, looking around, as if checking ... for surveillance" (ER 68). While Low walked through the main terminal and baggage claim areas to the curb outside, he looked over his shoulder 2–3 times (ER 68).

At curbside, Low and Akana appeared to be about to part company when Agents Hartman and Johnson approached Low, identified themselves as DEA agents, and asked Low if he would speak with them (ER 14–17). Low said yes (ER 17). Agent Johnson then asked him for his airplane ticket which Low presented (ER 17). The ticket was not returned to Low (ER 18). After Johnson looked at the ticket, he asked Low the length and nature of his visit and where he would stay that night (ER 18).[2] While Agent Johnson questioned

---

* The Honorable Rudi M. Brewster, United States District Judge for the Southern District of California, sitting by designation.

1. ER refers to appellant's excerpt of record unless indicated otherwise. Agent Johnson also submitted an affidavit in support of the criminal complaint the substance of which is that the amount of cocaine seized from Low is not consistent with personal use (CR 1).

2. The timing of Agent Johnson's examination of the ticket and his questioning of Low is important. Agent Johnson testified he asked Low about the nature and length of his visit *after* he looked at the ticket. However, Agent Hartman states in his affidavit that Agent Johnson made the inquiries about the nature and length of Low's stay *"[w]hile* examining the ticket" (ER 68). The district court found that "[w]hile examining [the ticket], the agents asked how long

Low, he held Low's ticket in his hand (ER 18). Low stated he was in Hawaii to attend his ex-partner's aunt's funeral and that he would be staying overnight at his ex-partner's house (ER 18). He also stated that he might return to Los Angeles later that night, that he was unable to tell Johnson his ex-partner's name other than Sam and that he did not know the name of the aunt who died (ER 18–19).

Agent Johnson then asked Low for identification and Low produced a California driver's license in the name of Michael Low (ER 17, 69). Low explained the discrepancy between the name on his ticket and the name on his license by stating that someone else had bought the airplane ticket for him (ER 69). During the course of the interview, Low was very nervous (ER 69). His hands shook, one of his legs shook and he was sweating (ER 69).

Agent Hartman then asked Low if he was carrying narcotics, which Low denied (ER 69). Hartman requested and was denied permission to search Low's two pieces of carry-on baggage (ER 69). Low was then advised that his briefcase and nylon bag were being detained for a canine sniff and that he could wait but that he was free to go (ER 69).

Low accompanied the agents to a DEA office where a dog "alerted" to both the nylon bag and briefcase (ER 70). Pursuant to a search warrant, (ER 53), a search of the nylon bag yielded two kilograms of cocaine (ER 24). Low subsequently signed a statement in which he admitted carrying the kilograms of cocaine in his bag and one-half gram of cocaine on his person (ER 25, 143A).

Low's motion to suppress was submitted on the transcript of the preliminary/bail hearing and the affidavit in support of the search warrant (Govt's ER 1–2). Although no evidentiary hearing was held, the parties presented oral argument (Govt's ER 4–21). The district court concluded the curbside interview was consensual but that a temporary detention based on articulable, reasonable suspicion occurred just prior to the canine sniff (ER 162).

defendant was intending to be in town" (ER

■ We review motions to suppress evidence *de novo*. *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986). The district court's findings of fact are upheld unless they are clearly erroneous. *United States v. Feldman*, 788 F.2d 544, 550 (9th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

■ Low contends that he was unlawfully detained in violation of the fourth amendment from the time Agent Johnson "retained" his airplane ticket, but he does not say precisely when this occurred. The government argues that all of the curbside encounter was consensual.

A person is "seized within the meaning of the fourth amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Law enforcement officers do not violate the fourth amendment by approaching an individual in a public place, "by asking him if he is willing to answer some questions, [and] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (*Royer*).

There was no seizure when Low gave the agent his airplane ticket. The agents approached Low in a public place and put questions to him he was willing to answer. He voluntarily produced his airplane ticket. Requesting and examining an airplane ticket is permissible and does not by itself constitute a seizure. *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326; *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1505 (9th Cir.1988) (*$25,000 U.S. Currency*). Having concluded this initial encoun-

156).

ter was consensual, we must consider if a seizure occurred when the agents took and kept Low's airplane ticket.

The retention of an airplane ticket "beyond the interval required for the appropriate brief scrutiny, may constitute a 'watershed point' in the seizure question." *United States v. Black*, 675 F.2d 129, 136 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983) (citation omitted).

The record is unclear whether Agent Johnson examined the ticket and then questioned Low about the purpose of his stay or if he questioned Low on this subject while he examined the ticket. Agent Johnson testified that *after* he examined the ticket, he questioned Low about the purpose of his visit (ER 18). Agent Hartman's affidavit states the questioning occurred *while* Johnson examined the ticket (ER 68).

If we assume that Agent Johnson examined the ticket, retained it, and resumed his questioning of Low, we must conclude that at this point Low was detained. *See United States v. Woods*, 720 F.2d 1022, 1025–26 (9th Cir.1983) (the taking and nonreturn of an unused airline ticket "was a clear objective indication that [defendant] was being temporarily detained") (*Woods*). [3] *See also United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (en banc) (retention of airplane ticket for more than a minimal amount of time is an implicit constraint on individual's freedom); *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982) (retention of unused portion of airplane ticket while asking for driver's license, then retaining both while interrogating defendant constituted detention). *Cf. $25,000 U.S. Currency*, 853 F.2d at 1504–05 (no seizure when detective examined airplane ticket; however, no evidence that ticket retained by detective). We must now determine if this detention was lawful.

A temporary detention of a person is justifiable under the fourth amendment if there is reasonable, articulable suspicion that a person has committed or is about to commit a crime. *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324. A person "may not be detained even momentarily without reasonable, objective grounds for doing so." *Id.*

Recently, the Supreme Court held in *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1583–87, 104 L.Ed.2d 1 (1989) that Sokolow's detention upon his arrival at the Honolulu International Airport was based on a reasonable suspicion supported by the following facts:

1.  He paid $2,100 in cash for two roundtrip plane tickets;

2.  He traveled under a name that did not match the name under which his telephone was listed;

3.  His original destination was Miami, a source city for illicit drugs;

4.  He stayed in Miami only 48 hours, even though a roundtrip flight from Honolulu to Miami takes 20 hours;

5.  He appeared nervous during his trip;

6.  He checked none of his luggage.

We turn to the facts of the present case. At the point Agent Johnson failed to return Low's ticket, the agents possessed the following information:

1.  Low had purchased a roundtrip ticket, Los Angeles to Honolulu, with cash in the name of Mark Lund.[4]

2.  The layover time between Low's arrival in Honolulu and his return to Los Angeles was a matter of hours.

3.  Low appeared very nervous when he departed the Pan Am ticket counter in Los Angeles and avoided eye contact with a police officer watching him.

4.  Before boarding, Low was looking nervously at persons in the terminal.

5.  The clothing Low wore after he boarded the airplane was different from the clothing he wore waiting to board.

6.  Two drug couriers had been discovered on Flight 81 before, one within a month of Low's flight, the second within a year of his flight.

---

**3.** We note that *Woods* was decided after *Royer*.

**4.** The agents did not know Low's name until *after* they asked him the nature and length of his visit. He was then asked for identification whereupon he presented his California driver's license in the name of Michael Low (ER 16, 69).

7. Shortly after deplaning, Low made a telephone call and was overheard to say, "This is Michelob," "I'll call you at number one," "Oh, I don't like hearing that."

8. After deplaning, Low looked around as though he was looking for surveillance.

9. During the course of the interview, Low was very nervous (ER 69).[5]

We compare the facts of *Sokolow* with those present here. Both Sokolow and Low purchased their roundtrip tickets in cash. Both had an unusually short layover considering the distance they traveled. Both appeared nervous during their trips. Both failed to check luggage.[6] Sokolow traveled under a name that did not match the name under which his telephone was listed. The agents did not know when they approached Low that he was traveling with a ticket in a name other than his own. However, the significance of the absence of this information is reduced because, in its place, is the fact of Low's statements made during his telephone call and overheard by Agent Hartman. Finally, although Honolulu is not a source city for illicit drugs, as is Miami, by this very fact it is a destination of drug traffickers.[7]

Each of the facts present here, taken alone, is not suspicious. When taken together, however, we must conclude under *Sokolow* they are sufficient to create a reasonable suspicion justifying a brief detention for questioning. *See Sokolow*, 109 S.Ct. at 1585–87.

Finally, if we assume that Agent Johnson questioned Low about the nature of his trip *while* he examined his ticket, we conclude the encounter during that time was consensual. *See Royer*, 460 U.S. at 501, 103 S.Ct. at 1326. Based on Low's answers to Agent Johnson's questions about the nature and length of Low's visit coupled with the information known to the agents prior to the stop, we have no difficulty concluding there existed facts sufficient to create a suspicion to temporarily detain Low at the conclusion of this portion of the interview.

The district court's order denying the motion to suppress evidence is AFFIRMED.

WIGGINS, Circuit Judge, joined by BREWSTER, District Judge, concurring:

I concur in the affirmance of Low's judgment and conviction. I write separately to state my disagreement with the developing law in our circuit and elsewhere, regarding the legal significance of "retaining" an airline ticket.

We are told that the retention of an airline ticket "beyond the interval required for the appropriate brief scrutiny, may constitute a 'watershed point' in the seizure question." *United States v. Black*, 675 F.2d 129, 136 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983) (citations omitted). The *timing* of the retention of the ticket is critical. For example, our memorandum states that if the agent questioned Low *after* retaining the ticket, a seizure occurred. *United States v. Woods*, 720 F.2d 1022, 1025–26 (9th Cir.1983). If, however, the agent's questions occurred *during* a brief detention of the ticket, no seizure results. *Id.*

Law enforcement officers stationed at airports to monitor passengers and, in appropriate cases, seize items of baggage suspected of containing narcotics have an enormously difficult job. They must identify "suspicious persons"; monitor their passage; and if their suspicions are not allayed, may confront the passenger with a request for his tickets so that the tickets may be briefly inspected. The disposition today does nothing to make that job easier. We tell the officer that he may accept the tickets that he requests; may inspect them briefly; but may not ask questions logically raised by the inspection, without having the possession of the tickets become a sei-

---

5. We take "during the course" to include the beginning of the interview.

6. There is no evidence in this record that Low checked any luggage. The clear inference is he did not. He passed through the baggage claim on his way to the curb without picking up any baggage.

7. See Agent Hartman's affidavit at ER 64 ¶ 5.

zure. There may be a certain logical appeal to this procedure, but it does not appeal to my common sense.

I would prefer a rule that permitted the officers to request the inspection of airline tickets in the possession of passengers. If a passenger consents, no seizure occurs when the tickets are delivered to the officer. The officer may thereupon retain the tickets for inspection and for questions based upon that inspection, *until the passenger clearly withdraws his consent.* I would hold that a passenger who asks for the return of his tickets has clearly withdrawn his consent. Such a rule would avoid much of the uncertainty that the present law encourages.