# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

BENNIE DEMETRIUS WASHINGTON,
          *Defendant-Appellant.*

No. 06-30386

D.C. No.
CR-05-00010-1-
ALH

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
March 8, 2007—Portland, Oregon

Filed June 19, 2007

Before: Ronald M. Gould, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Lisa Hay, Assistant Federal Public Defender, Portland, Oregon, for appellant Bennie D. Washington.

Stephen F. Peifer, Assistant United States Attorney, Portland, Oregon, for appellee United States of America.

---

## OPINION

GOULD, Circuit Judge:

On the night that led to the conviction of Bennie Demetrius Washington ("Washington") and this appeal, Washington was seated in his lawfully parked car, on a dark Portland street not long before midnight. Portland police officer Daryl Shaw ("Shaw") decided to initiate investigatory contact with Washington, though he lacked reasonable suspicion or probable cause of criminal activity. During this encounter, Washington consented to a search of his person, was ordered out of and directed away from his car, and was searched. Washington thereafter consented to a search of his car, where officer Troy Pahlke ("Pahlke") discovered a firearm. Washington moved to suppress the firearm, but the district court denied his motion, and Washington subsequently pled guilty to, and was convicted of, being a felon in possession of a firearm.

Although Washington voluntarily consented to the search of his person, we conclude that the encounter then escalated into an impermissible seizure. And even though Washington thereafter consented to the search of his car, during which the firearm was discovered, we conclude, contrary to the district court, that Washington's consent was not voluntary. Alternatively, the search of Washington's car and the firearm discovered therein were "fruits of the poisonous tree" that followed in an immediate unbroken chain from his illegal seizure, and

Washington's consent to the car search did not purge the taint of his illegal seizure.

## I

On November 23, 2004, at about 11:30 p.m., Washington, an African-American male, was sitting in the driver's seat of his Ford Taurus, which was lawfully parked in downtown Portland, Oregon. Portland police officer Shaw, a white male, saw Washington sitting in the car, did not suspect Washington of any crime, but decided to make contact to investigate.

Without activating his sirens or lights, Shaw parked his squad car a full car length behind Washington's car. Shaw approached Washington's car on the driver side and shined a flashlight into the car. Shaw was uniformed, and his baton and firearm were in plain view of Washington, but remained holstered throughout the encounter.

Shaw asked Washington what he was doing. Washington responded that "he was waiting for a friend." Shaw asked Washington if he had anything on his person that he should not have, and Washington answered "no." Shaw then asked Washington if he would mind if Shaw checked, and Washington responded "sure." Washington does not dispute that he consented to Shaw's search of his person.

Shaw then asked Washington to step out of the car. Although Shaw spoke cordially and did not use any threat of force, Shaw directed Washington to move away from his car until the two reached Shaw's squad car, a full car length away. Once there, Shaw searched Washington's person.

While Washington was exiting his car, Portland police officer Pahlke, a white male, arrived at the scene, parking his vehicle a few car lengths in front of Washington's car. Upon his arrival, Pahlke heard Shaw ask Washington to step out of and then direct Washington away from the car, and noticed

that when Washington exited his car, Washington's hands were raised. Pahlke positioned himself at the Taurus's partially open driver's side door, blocking Washington's entrance back into his car.

After the search of Washington's person, Shaw asked Washington if he had anything in his car that he should not have. Washington responded that he did not. Shaw then asked Washington if he minded if Pahlke searched the car. Washington responded "go ahead." During the search of Washington's car, Pahlke found the firearm that was the basis of Washington's prosecution and conviction. It is undisputed that neither Shaw nor Pahlke informed Washington that he could decline to consent to either the search of his person or the search of his car.

Recent relations between police and the African-American community in Portland are also pertinent to our analysis: According to testimony at the suppression hearing, in the one and a half years before Shaw initiated contact with Washington, there were two well-publicized incidents where white Portland police officers, during traffic stops, shot, and in one instance killed, African-American Portland citizens.[1] As a result of these incidents, the Portland Police Bureau published and distributed several pamphlets advising the public how to respond to a police stop.[2] Washington testified that he knew

---

[1]The first incident took place in May 2003. Portland police stopped a driver, cited the driver for a traffic infraction, and arrested the driver. The passenger, Kendra James, who was African-American, moved into the driver's seat, and attempted to end her encounter with the police and drive off. She was shot and killed as she attempted to drive away.

The second incident took place in 2004. Portland police stopped an African-American driver and shot him twenty-four seconds into the stop, as the driver was attempting to unfasten his seatbelt.

[2]At the suppression hearing, Bishop Wells, who served on the Portland Blue Ribbon Commission in 2000 that examined racial profiling in Portland, and on the Police Advisory Committee, testified that African-Americans are encouraged by the African-American community in conjunction with the Police Bureau, "to comply with officers doing stops to ensure that they did not do anything to contribute to the volatility of the scene. . . . They are encouraged to not try to advance any rights other than to stay alive relative to complying with the officer."

of and discussed with a friend one of the pamphlets,[3] which contained advice to citizens such as "follow the officer's directions" when stopped, and "if ordered, comply with the procedures for a search." Additionally, in a message from the Chief of Portland's Police Department, the pamphlet listed common reasons police will stop a person, such as a person "committed a crime," or "is about to commit a crime."

On January 13, 2005, a grand jury indicted Washington for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Washington filed a motion to suppress, and on May 2, 2005, the district court conducted a suppression hearing. The district court orally denied Washington's suppression motion, and issued a written order of that denial on May 3, 2005. The district court found that Shaw and Pahlke did not seize Washington at any time during their encounter with him, and that Washington voluntarily consented to the search of his car.

On November 7, 2005, Washington pled guilty to the charge, reserving his right to appeal the denial of his suppression motion. The district court on June 19, 2006 sentenced Washington to seventy months. Washington timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we vacate Washington's conviction.

## II

We review a district court's denial of a motion to suppress de novo. *See United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006). Whether an encounter between a defendant and an officer constitutes a seizure is a mixed question of law and fact that we review de novo. *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). We review the trial court's factual findings, however, for clear error. *See*

---

[3]This pamphlet was entitled "Teens and the Law." The other published pamphlet was entitled "Understanding Police Procedures."

*United States v. Howard*, 447 F.3d 1257, 1262 n.4 (9th Cir. 2006). And a district court's determination whether a defendant voluntarily consented to a search depends on the totality of circumstances and is a question of fact we review for clear error. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1125-26 (9th Cir. 2005).

Washington argues that the district court erred when it denied his motion to suppress because he was illegally seized by Shaw and Pahlke. Washington also argues that even if he was not seized, the district court clearly erred in finding that he voluntarily consented to the search of his car.

## A

**[1]** We first address whether Shaw's initial encounter with Washington constituted a seizure under the Fourth Amendment. A person is seized if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that an encounter is a seizure if "a reasonable person would have believed that he was not free to leave"); *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004).

**[2]** It is well established, however, that the Fourth Amendment is not implicated when law enforcement officers merely approach an individual in public and ask him if he is willing to answer questions. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005); *see also Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Mendoza-Cepeda*, 250 F.3d 626, 628 (8th Cir. 2001). No Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen. *See Royer*, 460 U.S. at 497; *see also Orhorhaghe v. INS*, 38 F.3d 488,

494 (9th Cir. 1994). This is true whether an officer approaches a person who is on foot or a person who is in a car parked in a public place. *See United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994). Moreover, it is clear that the permissible questions may include a request for consent to search, *see Muehler*, 544 U.S. at 101, "as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 435.

[3] We conclude that although Shaw conceded he suspected Washington of no criminal activity, Shaw's initial encounter with Washington was not a seizure and did not implicate the Fourth Amendment. In approaching the scene, Shaw parked his squad car a full car length behind Washington's car so he did not block it. Shaw did not activate his sirens or lights. Shaw approached Washington's car on foot, and did not brandish his flashlight as a weapon, but rather used it to illuminate the interior of Washington's car. Although Shaw was uniformed, with his baton and firearm visible, Shaw did not touch either weapon during his encounter with Washington. Shaw's initial questioning of Washington was brief and consensual, and the district court found that Shaw was cordial and courteous. Under these circumstances, the district court correctly concluded that a reasonable person would have felt free to terminate the encounter and leave. *See Kim*, 25 F.3d at 1430-31 (holding that an officer's initial encounter with Kim, who was seated in his lawfully parked car, was not a seizure or investigatory stop, where the officer parked his squad car partially blocking Kim's car, approached Kim's car on foot, and asked for, and received, permission to question Kim).

In sum, officer Shaw was entitled to question Washington for investigatory purposes, and the mere asking of questions, including asking for permission to search Washington's person, raised no Fourth Amendment issue so long as a reasonable person in Washington's situation would have felt free to leave.

**B**

We next address whether Washington was seized during the search of his person, before Washington gave his consent to the search of his car.

Even though Shaw did not inform Washington that he could refuse to consent to a search of his person, Washington does not dispute the district court's finding that he voluntarily consented to the search of his person. And although Washington was seated in his car with his car door closed when he gave this consent, a reasonable person in Washington's situation would have understood that the police officer might ask him to exit the vehicle in order to conduct the search because of valid concerns for officer safety. *See Michigan v. Long,* 463 U.S. 1032, 1049 (1983) (noting "that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect"); *see also Adams v. Williams*, 407 U.S. 143, 148 n.3 (1972) ("According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." (citation omitted). Otherwise, the police officer would have been forced to search the person through the car door window while the driver remained seated in the car within easy reach of any hidden weapons.[4] Accordingly, the fact that Shaw asked Washington to exit his car, after Washington consented to the search, would not warrant a reasonable person to

---

[4]Shaw's request that Washington exit the car after Washington voluntarily consented to the search of his person differs from a situation where an officer orders, directs, or instructs a person, who has not consented to search, to exit a car. Ordering an individual to exit a car may be a seizure depending on the totality of the circumstances. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.4(a) n.106 (4th ed. 2004) (listing federal and state cases that have held it is a seizure for an officer to order someone to exit a car). By contrast, we hold here that it was reasonable for Shaw to request Washington, who had voluntarily consented to be searched, to exit his car so Shaw could safely search Washington's person.

believe that he was not free to leave. Therefore, Washington was not unconstitutionally seized at this point.

**[4]** Washington's voluntary consent to the search of his person, however, does not preclude the possibility that officer Shaw improperly seized Washington as events unfolded. *See Mendoza-Cepeda*, 250 F.3d at 628 (recognizing that a consensual encounter may become a seizure); *United States v. Ayarza*, 874 F.2d 647, 650 (9th Cir. 1989) (stating that a consensual encounter "may evolve into a situation where the individual's ability to leave dissipates"). If Shaw and Pahlke's actions exceeded the scope of Washington's consent to the search of his person, such that a reasonable person in Washington's situation would not have felt free to depart if he so chose, then Shaw and Pahlke seized Washington. *See Terry v. Ohio*, 392 U.S. 1, 18 (1968) (recognizing that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"); *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1506 (9th Cir. 1988) (reasoning that even if the suspect voluntarily consented to a search of his bag, the law enforcement officers could have "seized [him] for purposes of the fourth amendment at a later point").

**[5]** We have identified several non-exhaustive situations where an officer's actions escalate a consensual encounter into a seizure: "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person," *Washington*, 387 F.3d at 1068 (internal quotation marks omitted), or "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendoza-Cepeda*, 250 F.3d at 628 (internal quotation marks omitted) (alteration omitted). In *Orhorhaghe*, we identified several factors to consider in determining if a person was seized, any one of which, if present, could constitute a sei-

zure: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter. *Orhorhaghe*, 38 F.3d at 494-96.

**[6]** Applying these factors, we conclude that under the total circumstances present in Washington's case, Shaw and Pahlke's encounter with Washington escalated into a seizure. It is undisputed that neither Shaw nor Pahlke used physical force or a threat of physical force in their interaction with Washington. And the district court found that Shaw was courteous and cordial when questioning Washington. Despite these findings, several facts support our conclusion that in the total circumstances a reasonable person in Washington's shoes would not have felt at liberty to terminate the encounter with the police and leave.

First, although the encounter took place on a public street, it happened around 11:30 p.m. in lighting that required Shaw to use a flashlight. Second, when Washington exited his car, he was confronted with two uniformed police officers. *See id.* at 495 & n.7 (citing with approval *United States v. Bloom*, 975 F.2d 1447, 1454 (10th Cir. 1992), which held that the questioning of one suspect by two DEA agents increased the encounter's coerciveness and tilted in favor of finding a seizure). And third, it is undisputed that neither Pahlke, nor Shaw, informed Washington of his right to terminate the encounter. *See United States v. Patino*, 649 F.2d 724, 727 (9th Cir. 1981), *abrogation on other grounds recognized by $25,000 U.S. Currency*, 853 F.2d at 1505 n.2 (holding that an officer's failure to inform a person that he has a right to terminate the encounter weighs in favor of finding a seizure).

Perhaps most important, the manner in which Shaw searched Washington's person was authoritative and implied

that Washington "was not free to decline his requests." *Orhorhaghe*, 38 F.3d at 495; *see also Patino*, 649 F.2d at 727 (holding that an officer seizes a person, when he indicates by his authoritative manner that the person is not free to leave). Pahlke testified that when Washington exited his car, Washington's hands were raised. *See United States v. Manzo-Jurado*, 457 F.3d 928, 934 n.3 (9th Cir. 2006) (holding that a police officer's order to occupants of a truck to "show their hands" was a seizure (internal quotation marks omitted)). And instead of searching Washington in front of, or nearby his car, Shaw directed Washington to move away from his car, and continued directing Washington where to walk until the two reached Shaw's squad car, a full car length away from the Taurus. Indeed, at one point, Washington testified that Shaw "corrected [Washington] to walk towards the back of [Shaw's] car." *See Royer*, 460 U.S. at 502-03 (reasoning that an officer's request that a person accompany the officer to another location weighs in favor of a reasonable belief by that person that he was not free to walk away); *see also Morgan v. Woessner*, 997 F.2d 1244, 1253 n.5 (9th Cir. 1993).

Additionally, Washington testified that when Shaw searched him, his hands were on the top of Shaw's squad car, with his back to Shaw. Washington indicated that Shaw "patted [him] all the way down" his body, and when Washington attempted to turn his head sideways, Shaw instructed him to "keep his head forward." Shaw's search appears to have exceeded a normal *Terry* frisk for weapons. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.6(b) (indicating that police "normally pat down only around the armpits and pockets during a stopping for investigation"). Instead, Shaw's search, and the manner in which it was conducted, put Washington in a position where a reasonable person would not have felt free to decline the requests and depart. Hence, the consensual search by Shaw had escalated to a seizure of Washington, whereby Washington could do nothing more than comply with Shaw's orders.

Finally, Pahlke's position during Shaw's search of Washington's person weighs in favor of finding a seizure. After Washington exited his car and began following Shaw's directions to move away from it and towards Shaw's squad car, Pahlke positioned himself between Washington and his car. If Washington wanted to end his encounter with Shaw and Pahlke and leave, he would have had to either: (a) leave on foot, abandoning his unlocked car, with the driver's door partially open; or (b) navigate through or around Pahlke to get back into his car. Neither option was realistic, especially considering Pahlke and Shaw outnumbered and outsized Washington.[5] *See United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982) (stressing that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance" in favor of finding a seizure).[6]

---

[5]The record from the suppression hearing reflects that Washington is five feet, ten inches tall, and weighed 159 pounds. Shaw testified that he is five feet ten inches tall, and weighed about 210 pounds; and Pahlke testified that he is six feet one inches tall, and weighed about 205 pounds.

[6]This case is distinguishable from the two cases on which the government relies: *United States v. Kim*, and *United States v. Summers*, 268 F.3d 683 (9th Cir. 2001). In *Kim*, Drug Enforcement Administration ("DEA") agent Aiu parked his unmarked car partially blocking Kim's car, approached Kim's car, requested permission to ask Kim questions, and then asked for Kim's identification. 25 F.3d at 1428. Although Aiu's car partially blocked Kim's car, we stressed that Aiu's asking for permission to question Kim left open the possibility that Kim could refuse. *Id.* at 1431.

This case is unlike *Kim*. Here, Washington was alone at night and engaged by two uniformed police officers. Conversely, DEA Agent Aiu was plain-clothed, approached Kim during the day, and Kim and his companion matched in numbers Aiu and the other agent. *Id.* at 1428. If there were bystanders to Washington's search, they were in the distance and not close-by, contrary to *Kim*. *Id.* In the instant case, Shaw did not first request permission to question Washington, whereas Aiu did in *Kim*. *Id.*

In *Summers*, after observing suspicious behavior by Summers, officer Barclift parked his car so as not to block in Summers's car, but it was Summers who then approached Barclift on foot. 268 F.3d at 685. In

**[7]** In sum, under the totality of the circumstances —
Shaw's authoritative manner and direction of Washington
away from Washington's car to another location, the publi-
cized shootings by white Portland police officers of African-
Americans, the widely distributed pamphlet with which
Washington was familiar, instructing the public to comply
with an officer's instructions, that Shaw and Pahlke outnum-
bered Washington two to one, the time of night and lighting
in the area, that Pahlke was blocking Washington's entrance
back into his car, and that neither Pahlke, nor Shaw, informed
Washington he could terminate the encounter and leave — we
conclude that a reasonable person would not have felt free to
disregard Shaw's directions, end the encounter with Shaw and
Pahlke, and leave the scene. *See Royer*, 460 U.S. at 501-02
(holding a seizure occurred when the defendant was asked by
law enforcement officers to relocate to a police room without
being told he was free to depart); *Washington*, 387 F.3d at
1064, 1068-69 (concluding a seizure occurred when the
defendant and his companion were engaged by six officers in
an outdoor hallway outside of his motel room, the officers
moved the defendant "twenty to thirty feet away from his

response to Barclift's request for identification, Summers led the officer
to his car where Barclift observed a firearm in plain view. *Id.* We held that
this encounter was not a seizure under the Fourth Amendment because
Barclift did not activate his sirens or lights, did not block in Summers, and
Summers approached the officer. *Id.* at 687.

Here, unlike in *Summers*, Washington did not approach Shaw, rather it
was Shaw who initiated contact with Washington. Washington's encoun-
ter with Shaw and Pahlke was longer than Barclift's contact with Sum-
mers. *Id.* at 685. Washington was outnumbered two-to-one, whereas,
Summers and Barclift were alone. And unlike Summers, who led Barclift
to his vehicle where Barclift observed the illegal firearm, Washington was
directed away from his vehicle and Pahlke positioned himself between
Washington and his car's driver's side door. *Id.*

Thus, the facts present in Washington's case, in contrast to those in
*Summers* and *Kim*, weigh in favor of finding that Shaw and Pahlke seized
Washington.

door," and the officers never informed the defendant that he had a right not to respond to their questions and terminate the encounter). We hold that Shaw and Pahlke exceeded the scope of Washington's consent to search his person and seized him.

## C

**[8]** Having concluded that Shaw and Pahlke seized Washington, we must determine if that seizure violated the Fourth Amendment. A seizure of a person is justified under the Fourth Amendment if law enforcement officers have reasonable suspicion that a person committed, or is about to commit, a crime. *See Royer*, 460 U.S. at 498; *see also United States v. Low*, 887 F.2d 232, 235 (9th Cir. 1989). Without reasonable suspicion, a person "may not be detained even momentarily." *Royer*, 460 U.S. at 498.

**[9]** The government concedes that at the time Shaw searched Washington's person, neither Shaw nor Pahlke possessed reasonable suspicion or probable cause that Washington was engaged in criminal activity. Accordingly, Shaw and Pahlke's seizure of Washington violated the Fourth Amendment. *See id.*

## D

**[10]** However, the district court found that Washington voluntarily consented to the search of his car. Thus, we must determine whether the firearm found in Washington's car was admissible evidence despite the initial constitutional violation. It is well established that, under the "fruits of the poisonous tree" doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was "purged of the primary taint." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) ("The question in a ['fruit of the poisonous tree'] case is whether, granting

establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (internal quotation marks omitted)); *see also Royer*, 460 U.S. at 501; *United States v. Patzer*, 277 F.3d 1080, 1084 (9th Cir. 2002) (concluding that a consent to search after a violation of the Fourth Amendment may be tainted by that violation, and so be invalid and inadmissible). The test for admissibility of the evidence under these circumstances is two-fold: not only must the consent be voluntary, but it must also be "sufficiently an act of free will to purge the primary taint." *Wong Sun*, 371 U.S. at 486, 488; *see also Brown v. Illinois*, 422 U.S. 590, 602 (1975); *Anderson v. Calderon*, 232 F.3d 1053, 1072, 1076 (9th Cir. 2000), *abrogation on other grounds recognized by Osband v. Woodford*, 290 F.3d 1036, 1043 (9th Cir. 2002). Although there is overlap between the voluntariness test and the fruits test for attenuation, the two tests are not congruent, and evidence derived from a consensual search is only admissible if "the consent was both voluntary and not an exploitation of the prior illegality." Wayne R. LaFave, 4 *Search and Seizure* § 8.2(d) (listing cases so holding).

**1**

We first address the district court's conclusion that Washington's consent to the search of his car was voluntary.[7] We have identified five factors, none of which is individually dispositive, to determine if a consent to search was voluntarily given: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified

---

[7]We review this finding under the totality of the circumstances, and apply a clear error standard. *See Rodriguez-Preciado*, 399 F.3d at 1125-26. "[E]vidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).

that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (internal quotation marks omitted).

Applying these factors, we hold that the district court clearly erred in finding that Washington's consent to the search of his car was voluntary. As to the first factor, although the district court found that Washington was not in custody, as we discuss above, that finding was clearly erroneous. When Shaw asked Washington for consent to search his car[8] Washington was already seized, and a reasonable person would not have felt free to terminate the encounter and leave. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (holding that an individual is in custody if considering the circumstances surrounding an interrogation "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave"). Although this is but one factor, our conclusion that Washington was seized has a major impact on our analysis because the district court's ruling on the voluntariness of Washington's consent was made with the opposite conclusion. *See Chan-Jimenez*, 125 F.3d at 1327 ("[T]he district court based its voluntariness determination in large part on an erroneous legal conclusion that no seizure had occurred. While the district court's error on this issue does not change our standard of review, it nevertheless strongly influences our resolution of the case.").

We also find significant the context in which Washington made his decision whether to consent to the search of his car: (1) at night, (2) outnumbered two-to-one, (3) in the unique situation in Portland between the African-American community and the Portland police, and (4) after complying with Shaw's detailed instructions, (5) and being searched under Shaw's

---

[8]The district court made a factual finding that Shaw asked Washington for permission to search Washington's car after Shaw conducted the search of Washington's person.

direction, at Shaw's squad car with his hands on the top of the squad car, (6) with the return to his car blocked by Pahlke, so that (7) a reasonable person in Washington's circumstances would not have felt free to terminate the encounter and leave.

The second factor weighs in favor of the government, because the district court found that Shaw did not have his gun drawn. The third factor is not applicable to Washington's situation — *Miranda*[9] warnings were not necessary as Washington was not subject to custodial interrogation. Regarding the fourth factor, it is undisputed that neither Shaw nor Pahlke explained to Washington that he could refuse to consent to the search of his car, so this factor favors Washington. Finally, the fifth factor favors the government. Neither Shaw nor Pahlke intimated to Washington that his failure to give consent to the car search would be futile because the officers could obtain a search warrant if they so desired. *See Kim*, 25 F.3d at 1432.

**[11]** Although two factors favor the government and two favor Washington, our conclusion that Washington would not have felt free to depart, in the particular circumstances presented, raises grave questions on whether his consent to the car search can be considered voluntary. *See United States v. Yousif*, 308 F.3d 820, 831 (8th Cir. 2002) (holding that Yousif's consent to the search of his vehicle was involuntary because Yousif's consent was made in a coercive environment and followed a violation of his Fourth Amendment rights); *United States v. Valdez*, 931 F.2d 1448, 1452 (11th Cir. 1991) (holding that "Valdez's consent was tainted by the illegal pretextual stop and detention" that preceded his consent to the search of his car, and that this factor weighed in favor of concluding that "Valdez's consent to search was not voluntary"). The district court clearly erred in finding that Washington was not seized, and this factor in context deserves significant weight in our assessment of voluntariness. Having carefully

---

[9]*Miranda v. Arizona*, 384 U.S. 436 (1966).

considered the totality of the circumstances in which Washington gave his consent to his car being searched, we hold that the district court also clearly erred in ruling that Washington's consent was voluntary. Given that it was late at night on a dark street, that Washington had been led away from his car and seized by two police officers, and the tension between the African-American community and police officers in Portland in light of the prior shootings above-mentioned, we have no confidence that Washington's assent to the car search was voluntary under the total circumstances.

### 2

Even if we are incorrect in concluding that Washington's consent to the car search was involuntary, that does not necessarily render the discovered firearm admissible against Washington. If Washington's consent was not gained through "means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 488, then the district court erred when it denied Washington's motion to suppress the firearm.

Assuming, *arguendo*, that Washington's consent to search his car was voluntary, to determine if this consent purged the taint of Washington's illegal seizure, we consider: (1) "the temporal proximity" of the consent and the illegal seizure; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy of the official misconduct."[10]

---

[10]Although the Court in *Brown* also considered as a factor whether *Miranda* warnings were given, *Brown* dealt with a confession after an illegal arrest. *See id.* at 603-04. In *Royer*, the Supreme Court applied the fruits doctrine to determine if a consent to search was the fruit of a prior illegal seizure. *Royer*, 460 U.S. at 507-08. We follow our precedent, and our sister circuits, in applying the factors listed in *Brown* to the situation of consent after an illegal seizure. *See United States v. Arvizu*, 232 F.3d 1241, 1252 (9th Cir. 2000) (applying the *Brown* factors), *rev'd on other grounds*, 534 U.S. 266 (2002); *United States v. McSwain*, 29 F.3d 558, 563-64 (10th Cir. 1994) (same); *United States v. Chavez-Villarreal*, 3 F.3d 124, 127-28 (5th Cir. 1993) (same); *United States v. Valdez*, 931 F.2d 1448, 1452 (11th Cir. 1991) (same).

*Brown*, 422 U.S. at 603-04; *see also Patzer*, 277 F.3d at 1084. The government bears the burden of showing admissibility. *See Brown*, 422 U.S. at 604; *Patzer*, 277 F.3d at 1084-85.

**[12]** Here, the factors fairly and practically dictate our conclusion that Washington's consent did not purge the taint of his illegal seizure. There was no time lapse. Shaw requested Washington's consent to search the car immediately after he conducted a search of Washington's person, and while Washington was illegally seized.[11] And there were no appreciable intervening circumstances.

The third factor also weighs against the government. After initiating an encounter with Washington without any reasonable suspicion or probable cause, and after searching Washington's person and coming up empty-handed, Shaw pressed Washington for permission to search the Taurus. Shaw was on a fishing expedition "in the hope that something [illegal] might turn up." *Brown*, 422 U.S. at 605. Moreover, because we hold that Shaw and Pahlke impermissibly seized Washington, this weighs towards suppression. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (reasoning that the purpose and flagrancy of the misconduct weighed against the government because the court "found that the initial stop violated [the] Defendants' Fourth Amendment rights").

**[13]** We therefore hold that Washington's consent to the search of his car, even if voluntarily given, was not sufficient to purge the taint of his illegal seizure.[12] The firearm Pahlke found in Washington's car was a fruit of the poisonous tree.

---

[11]Although Shaw testified that he asked for Washington's consent to search the car while he was searching Washington's person, the district court made a factual finding that Shaw asked Washington for permission to search the car after Shaw conducted the search of Washington's person. Regardless, even if Shaw's testimony is correct, it only further supports our conclusion because then the time lapse would be nil.

[12]Because we vacate Washington's conviction, we need not address the other argument Washington makes on appeal: that the district court erred in sentencing him because it did not properly consider the 18 U.S.C. § 3553(a) factors.

## III

**[14]** We have concluded that the consent Washington gave to the search of his car cannot be considered to be voluntary in the totality of circumstances. And even if the consent was voluntary, it followed an illegal seizure of Washington, and the taint of that illegal seizure was not attenuated by further events. On either of the above theories, the evidence of the firearm found in Washington's car necessarily should have been suppressed, and the district court erred by denying Washington's motion to suppress. Washington's conviction therefore cannot stand.

**VACATED**, and **REMANDED** to the district court for further proceedings consistent with this opinion.