Filed 3/25/15  P. v. Richey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C075008 |
| v. | (Super. Ct. No. 12F05450) |
| ANTHONY GIOVONNI RICHEY, | |
| Defendant and Appellant. | |

A jury convicted defendant Anthony Giovonni Richey of carrying a concealed firearm (Pen. Code, § 25400, subds. (a)(2) & (c)(6) -- count 1)[1] and carrying a loaded firearm in public (§ 25850, subds. (a) & (c)(6) -- count 2), along with a misdemeanor violation for being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a) -- count 3).

Defendant now contends the trial court erred in denying his motion to suppress illegally seized evidence.  (§ 1538.5.)  Finding no error, we will affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

1

BACKGROUND

Defendant moved to suppress the evidence against him pursuant to section 1538.5. At the hearing on the motion to suppress, Detective David Gutierrez of the Citrus Heights Police Department testified that he was driving through a high crime neighborhood with his partners, Detectives Joe Davis and Daniel Hefner, at approximately 3:30 p.m. on the afternoon of August 8, 2012. The three detectives were wearing plain clothes and driving an unmarked van. Detective Gutierrez was riding in the front passenger seat.

As they turned onto the residential street known as Treeleaf Way, Detective Gutierrez observed defendant riding his bicycle down the street in the opposite direction. Detective Gutierrez noticed that defendant appeared to be staring at them. At the hearing, the parties stipulated that Detective Hefner, who was driving the van, had pulled his shirt up over his nose.[2]

After passing defendant on the street, Detective Gutierrez turned around and watched as defendant, still keeping an eye on the unmarked van, nearly crashed his bicycle in the middle of the street. The detectives did not stop, but continued driving in the direction of their destination, a suspected drug house in the area.

A short time later, Detective Gutierrez spotted defendant a second time, riding his bicycle down a nearby street. Once again, defendant was riding towards the detectives, who were driving down the street in the opposite direction. Based on his familiarity with the neighborhood, Detective Gutierrez believed that defendant was "looping back around towards the same area that he just came from." Detective Gutierrez found this behavior noteworthy because, based on his training and experience, "people that are looking to commit crimes will often drive the neighborhood to see if anybody is paying attention or if there is anybody out and about."

---

[2] During the subsequent jury trial, Detective Hefner testified that he pulled his shirt over his nose in response to a foul odor in the van.

2

The detectives decided to make contact with defendant. According to Detective Gutierrez, "We pulled forward. He was driving -- he was riding his bicycle on the right-hand portion of the roadway headed towards us. Detective Hefner began to move because I said, hey, let's get on top of this guy, so we moved forward. We were on the right side of the roadway. Detective Hefner parked on the right side of the roadway."

Detectives Davis and Gutierrez donned police tactical vests with the word "Police" inscribed on the front and stepped out of the van. Detective Hefner, wearing a police t-shirt, joined them moments later. The detectives did not activate their siren or emergency lights.

Using a normal, conversational tone of voice, Detective Gutierrez "identified [himself] as a police officer and [he] asked [defendant] if he would mind stopping and talking with [them]." None of the detectives raised their voices, drew their weapons, or touched defendant.

Defendant, on his own initiative, stopped riding his bicycle and dismounted. The detectives, standing approximately 10 feet away, engaged defendant in conversation. At no point during the conversation did any of the detectives tell defendant that he was under arrest, detained, or otherwise not free to leave.

During their conversation, Detective Gutierrez observed that defendant exhibited objective signs of being under the influence of a controlled substance, including tremors and constricted pupils. Detectives Davis and Gutierrez performed field sobriety tests on defendant and formed the opinion that he was under the influence of a central nervous system stimulant.

Defendant was arrested for being under the influence of a controlled substance. After receiving *Miranda*[3] warnings, defendant told Detective Gutierrez that he smoked

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

3

methamphetamine every day and that he had smoked methamphetamine a few hours before making contact with the detectives. Detective Gutierrez conducted a search incident to arrest and discovered a .25-caliber handgun in defendant's pocket. Defendant was not the registered owner of the gun.

On cross-examination, Detective Gutierrez testified that "Detective Hefner was driving on the right-hand side of the roadway," but stopped "[n]ear the middle" of the street. According to Detective Gutierrez, "We were actually behind [defendant] because he had actually ridden past a little bit, so we were behind him. At no time did we ever block his path." Detective Gutierrez denied that he contacted defendant because he was riding his bicycle in an erratic manner.

On redirect, Detective Gutierrez clarified that the van, though parked near the middle of the street (as measured from sidewalk to sidewalk), did not obstruct defendant's lane of travel. Defendant did not testify at the suppression hearing.

Following oral argument, the trial court said: "I believe this had all the inner marks of, really, a consensual encounter. I mean, the very fact that the officers didn't turn around, pull up to the defendant after the initial encounter, suggests to me they weren't going out just to harass this guy. It was only after they had proceeded on their way, and all of a sudden they see this same bicyclist headed back toward their way. I think that's sufficiently curious that if I were an officer, I might get out of my van and ask, hey, what's going on. That's, I think, what they did. I take the officers at their word that they didn't block his way, that they asked politely." The trial court went on to say, "And in this case I think that initial encounter did not constitute a detention, based on all the evidence that I have seen. It was a consensual encounter, and I think the officer's testimony was they eventually -- immediately saw what he thought were the signs of intoxication. And [defendant is] not contesting what went on from there." The trial court denied defendant's suppression motion.

4

The matter proceeded to trial and the jury found defendant guilty as charged on all three counts and found certain special allegations true. The trial court suspended imposition of sentence and placed defendant on probation for three years. The trial court also ordered defendant to serve 30 days in county jail.

## DISCUSSION

Defendant claims the trial court erred in denying his motion to suppress evidence. He contends he was illegally detained without reasonable suspicion, in violation of the Fourth Amendment. We disagree.

"Whether a seizure occurred within the meaning of the Fourth Amendment is a mixed question of law and fact qualifying for independent review. [Citations.] Accordingly, 'we review the trial court's findings of historical fact under the deferential substantial evidence standard, but decide the ultimate constitutional question independently. [Citations.]' [Citation.] We must accept factual inferences in favor of the trial court's ruling. [Citation.] If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them. [Citations.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

"For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever -- i.e., no 'seizure,' however minimal -- and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] Second, there are . . . 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] Third, and finally, there are those seizures of an individual which

5

exceed the permissible limits of a detention, . . . which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime. [Citation.]" (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 (*Wilson*).)

Consensual encounters do not trigger Fourth Amendment scrutiny. (*Florida v. Bostick* (1991) 501 U.S. 429, 434 [115 L.Ed.2d 389, 398] (*Bostick*).) Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. (*Wilson, supra*, 34 Cal.3d at p. 784.) The United States Supreme Court has made it "clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." (*Bostick,* at p. 434.) So long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. (*Ibid.*) Only when the officer, by means of physical force or show of authority, has in some manner restrained an individual's liberty does a seizure occur. (*Ibid.*; *Wilson*, at pp. 789-790.)

" '[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

6

Here, there is nothing in the record that suggests the detectives " 'by means of physical force or show of authority, . . . in some way restrained [defendant's] liberty . . . .' '' (*Bostick, supra*, 501 U.S. at p. 434 [115 L.Ed.2d at p. 398], *Wilson, supra*, 34 Cal.3d at pp. 789-790.) There is no evidence that they drove towards defendant at a high rate of speed, screeched to a halt, or activated their emergency lights or siren. Nor is there any evidence that the detectives approached defendant in a coercive or confrontational manner, by drawing their weapons, raising their voices, or commanding defendant to stop. Instead, the detectives pulled over, identified themselves as police officers, and asked "if [defendant] would mind stopping and talking with [them]." Defendant responded by voluntarily stopping and dismounting his bicycle.

Relying on *People v. Jones* (1991) 228 Cal.App.3d 519 (*Jones*), defendant contends that a reasonable person would have believed that he was being detained from the manner in which the detectives parked their van. Defendant's reliance on *Jones* is misplaced.

In *Jones*, an officer spotted the defendant standing on the sidewalk with two other men. The officer "suddenly" pulled his patrol car "to the wrong side of the road," parked it "diagonally against the traffic," got out, and told the defendant, who was walking away, to stop. (*Jones, supra*, 228 Cal.App.3d at pp. 522-523.) When the defendant reached towards a pocket, the officer " 'grabbed his left forearm.' " (*Id.* at p. 522.) As the officer withdrew the defendant's hand from the pocket, he saw a clear plastic bag containing what he suspected was cocaine. (*Ibid.*) The trial court granted the defendant's motion to suppress and the Court of Appeal affirmed because "[a] reasonable man does not believe he is free to leave when directed to stop by a police officer who has arrived suddenly and parked his car in such a way as to obstruct traffic." (*Id.* at p. 523.)

Here, in contrast to *Jones*, there is no evidence that the detectives "arrived suddenly" or "parked [their] car in such a way as to obstruct traffic." (*Jones, supra*, 228 Cal.App.3d at p. 523.) Although the detectives parked "near the middle" of the road,

there is nothing in the record to suggest that they parked against traffic on the wrong side of the road. Here, in contrast to *Jones*, the detectives did not use the van to assert their authority or block defendant's route. To the contrary, the record reflects that the detectives parked behind defendant, thereby giving him the option to continue on his way. (See *People v. Franklin* (1987) 192 Cal.App.3d 935, 940 ["Certainly, an officer's parking behind an ordinary pedestrian reasonably would not be construed as a detention. No attempt is made to block the way"].) Furthermore, unlike the officer in *Jones*, the detectives did not direct defendant to stop or touch him. Thus, we conclude that *Jones* is distinguishable.

Defendant also claims to find support for his contention that he was detained in *United States v. Washington* (9th Cir. 2007) 490 F.3d 765, 772 (*Washington*). *Washington* is also distinguishable.

In *Washington*, the defendant, Washington, was seated in his lawfully parked car on a dark street shortly before midnight. (*Washington, supra*, 490 F.3d at p. 767.) He was approached by a uniformed police officer, Shaw. (*Id.* at p. 768.) Shaw politely requested and received Washington's consent to search his person. (*Ibid.*) However, the tone of the encounter changed when, "instead of searching Washington in front of, or nearby his car, Shaw directed Washington to move away from his car, and continued directing Washington where to walk until the two reached Shaw's squad car, a full car length away from [Washington's car]." (*Id.* at p. 772.) In the meantime, another officer arrived at the scene and positioned himself between Washington and his car, thereby interfering with Washington's ability to end the encounter and drive away. (*Id.* at p. 773.) During the search, Washington's hands were placed on top of Shaw's squad car and Washington was instructed to "keep his head forward." (*Id.* at p. 772.)

After searching Washington's person, the officers requested and received Washington's consent to search his car, where they found a firearm. (*Washington, supra*, 490 F.3d at p. 768.) Washington was arrested for being a felon in possession of a firearm

8

and moved to suppress.  (*Id.* at p. 769.)  The district court denied the motion and the Ninth Circuit reversed, finding that even though Washington consented to the search of his person, the encounter escalated into an impermissible seizure, and Washington's consent to search the car was not voluntary.  (*Id.* at p. 767.)

In reaching this result, the Ninth Circuit considered a number of factors, including the fact that Washington was approached at night on a dark street, that he was outnumbered two-to-one, and that he was not informed of his right to terminate the encounter.  (*Washington, supra*, 490 F.3d at p. 772.)  However, there is nothing in *Washington* to suggest that the Ninth Circuit considered any of these factors dispositive. To the contrary, the Ninth Circuit's conclusion was based on the totality of the circumstances.  (*Id.* at p. 773; see also *Manuel G., supra*, 16 Cal.4th at p. 821 [the court " 'must consider all the circumstances surrounding the encounter.' [Citation.] . . . [and] assess[] the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation"].)  "Perhaps most important," the Ninth Circuit explained, "the manner in which Shaw searched Washington's person was authoritative and implied that Washington 'was not free to decline his requests.' [Citation.]"  (*Washington, supra*, 490 F.3d at p. 772.)  In this case, by contrast, there is no evidence that any of the detectives adopted an authoritative tone or otherwise implied that defendant was not free to decline their requests.

Furthermore, though defendant was approached by three detectives, the presence of several officers does not, without more, transform an encounter into a detention. (See *United States v. Drayton* (2002) 536 U.S. 194, 205 [153 L.Ed.2d 242, 254] (*Drayton)* [a second officer's presence during an encounter on a bus did not turn an encounter into a seizure]; *INS v. Delgado* (1984) 466 U.S. 210, 219 [80 L.Ed.2d 247, 257] [presence of several agents by exits posed "no reasonable threat of detention"].) Here, unlike the officers in *Washington*, the detectives did not engage in any coercive

conduct that would make a reasonable person feel that he or she was not free to leave. (*Manuel G., supra*, 16 Cal.4th at p. 821.)

Nor can the encounter be deemed a detention because the detectives did not inform defendant that he was free to leave. Indeed, the record suggests Detective Gutierrez would have had no opportunity to tell defendant he was free to leave, since he immediately noticed objective signs that defendant was under the influence of a controlled substance. In any event, the U.S. Supreme Court has "rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. [Citations.] . . . . Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning. [Citations.]" (*Drayton, supra*, 536 U.S. at pp. 206-207 [153 L.Ed.2d at pp. 254-255].) Here, as we have explained, a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was free to continue on his way.

Relying on *Drayton, supra,* 536 U.S. 194 [153 L.Ed.2d 242], defendant argues the encounter was coercive because two of the three detectives were wearing bulletproof vests and all were carrying holstered weapons. However, *Drayton* teaches that the presence or lack of a uniform and holstered firearm should "have little weight in the analysis" for determining whether a seizure occurred. (*Drayton, supra*, 536 U.S. at p. 204 [153 L.Ed.2d at p. 254]) Here, the detectives did not draw their weapons or otherwise engage in coercive conduct. On this record, the fact that two of the detectives were wearing bulletproof vests and all were carrying holstered weapons does not constitute coercive action. (*Id.* at p. 202.)

Finally, defendant argues the encounter was coercive because it took place on a quiet residential street. However, the encounter took place on a public street in broad daylight. There is nothing in the record to suggest that the encounter took place at night,

10

in an isolated area, or out of the public's view.  Thus, we reject defendant's contention that the encounter was coercive by reason of its location.

Under the totality of the circumstances discussed *ante*, we conclude defendant's initial encounter with the detectives was consensual.  During that time, Detective Gutierrez observed that defendant was under the influence of a controlled substance, thereby giving Detective Gutierrez a reasonable suspicion on which to base the subsequent detention.  Accordingly, since defendant's detention took place only after Detective Gutierrez had reasonable suspicion to detain him, the detention, which led to the arrest and the search incident to the arrest, was proper.  (*People v. Souza* (1994) 9 Cal.4th 224, 231 [a detention is initially justified "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity"].)  The trial court properly denied defendant's motion to suppress.

DISPOSITION

The judgment is affirmed.


                                                    MAURO          , J.


We concur:


       HULL            , Acting P. J.


       ROBIE         , J.


11